NEW ENGLAND EQUITABLE INS. CO. et al. v. MECHANICS'–AMERICAN NAT. BANK OF ST. LOUIS.   (No. 6070.)†

(Court of Civil Appeals of Texas.   May 7, 1919.)

1. PRINCIPAL AND SURETY ⬳77—LIABILITY OF SURETY—CONSTRUCTION OF BOND—WAREHOUSE RECEIPTS.

Where milling company, not a bonded warehouse, for purpose of securing loans, gave bond with surety reciting that company intends to operate an elevator for warehousing of grain and will be desirous of obtaining loans from obligee on warehouse receipts issued by it, etc., surety cannot defeat liability on bankruptcy of milling company which did not have amount of wheat in elevator as evidenced by the receipts it gave on ground that bonded warehouse receipts were meant and none were issued, all parties to transaction knowing that milling company could not issue public bonded warehouse receipts.

2. EVIDENCE ⬳448—PAROL EVIDENCE—AMBIGUOUS CONTRACT.

It is permissible, if there be any uncertainty as to the meaning of a written instrument, to ascertain the condition of the parties at the time the same was executed, and to construe the language of the instrument in the light of such circumstances.

3. EVIDENCE ⬳65 — KNOWLEDGE OF LAW — PRESUMPTION.

It must be presumed that parties dealing with a milling company having a grain elevator knew the law that prohibited a public warehouseman from issuing warehouse receipts against its own property.

4. WAREHOUSEMEN ⬳3—"WAREHOUSE."

In common parlance a "warehouse" is a house used for storing goods, wares and merchandise, whether for the owner or for some one else, and whether the same be a public or private warehouse.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Warehouse.]

---

⬳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

†Rehearing denied.

5. PRINCIPAL AND SURETY ⚙77—BOND—CON- STRUCTION — BANKRUPTCY OF PRINCIPAL — FRAUDULENT ISSUANCE OF WAREHOUSE RE- CEIPTS.

Where milling company having elevator in which it stored its own wheat was granted loans of $10,000 at different times evidenced by three promissory notes of that amount, and company gave as collateral its warehouse receipts cover- ing wheat in elevator, and also gave bond with surety with obligation against fraudulent issue of certificate, withdrawal of wheat without re- turn of certificate and conversion of wheat by milling company, surety, on facts showing that on issuance of first note company had full amount of wheat in elevator, but not requisite amount on issuance of other two notes, and that company went into bankruptcy, having no wheat on hand, was liable as to first note for the distributive share that the obligee would have received with other creditors if converted wheat had been on hand at market price at time of bankruptcy, but as to other notes was liable at face of notes, as the certificates securing these were fraudulently issued.

Appeal from District Court, McLennan County; H. M. Richey, Judge.

Action by the Mechanics'-American Nation- al Bank of St. Louis against the New Eng- land Equitable Insurance Company and oth- ers. Judgment for plaintiff, and defendants appeal. Modified, and, as modified, affirmed.

Head, Dillard, Smith, Maxey & Head, of Sherman, for appellants.

J. D. Williamson, of Waco, for appellee.

### Findings of Fact.

JENKINS, J. The Alliance Milling Com- pany, hereinafter referred to as the milling company, was a corporation doing a milling business at Denton, Tex., buying wheat and grinding the same into flour, which it sold on the market. It owned and operated an eleva- tor of about 250,000 bushels capacity, in which it stored its own wheat. It was not a pub- lic warehouseman. The nature of its busi- ness was known to appellant prior to the execution of the bond hereinafter set out.

Appellee was a corporation doing a gener- al banking business in St. Louis, Mo.

Appellant was a corporation with a branch office in St. Louis, Mo., doing a bonding and insurance business for hire.

The milling company, being desirous of obtaining a line of credit of $50,000 from ap- pellee, applied for same, offering as security therefor wheat to be held by it in its eleva- tor, and evidenced by its wheat deposit cer- tificates, called warehouse certificates, to be issued from time to time as loans were ob- tained, such wheat to be held by it in its elevator until the note for which it was se- curity was paid. The appellee was willing to make such loans only on condition that appellant should execute to it a bond for $50,000, conditioned that it would indemnify appellee against: (1) The fraudulent issuance of such certificates; (2) the withdrawal of the wheat without the return of the certifi- cates against which the same was issued; and (3) the conversion of such wheat by the milling company. These facts were known to and understood by each of said parties.

In accordance with said agreement and understanding, appellant, on July 19, 1915, for a valuable consideration to it paid, ex- ecuted and delivered to appellee the follow- ing bond:

"Know all men by these presents that we, the Alliance Milling Company, a corporation creat- ed by and existing under the laws of the state of Texas, with principal office in the city of Denton, Tex. (hereinafter called the principal), as principal, and the New England Equitable Insurance Company, of Boston, Mass. (herein- after called the surety), as surety, are held and firmly bound unto the Mechanics'-American National Bank, St. Louis, Mo. (hereinafter called the obligee), in the full and just sum of fifty thousand and $00/100$ ($50,000.00) dollars good and lawful money of the United States of Amer- ica, to the payment of which we bind ourselves, our successors or assigns, firmly by these pres- ents.

"Dated at St. Louis, Mo., this 19th day of July, A. D. 1915.

"The condition of the above obligation is such that

"Whereas, the above-named principal intends to operate at Denton, Tex., an elevator for the storage and warehousing of grain and from time to time will be desirous of obtaining loans from the above-named obligee on warehouse receipts issued by it; and

"Whereas, the obligee is desirous of granting such loans:

"Now, therefore, the condition of this obliga- tion is such that, if the principal shall on de- mand indemnify and hold harmless the said obligee against any loss or damage directly aris- ing by reason of the issuance of fraudulent warehouse receipts signed by J. N. Rayzor of the above-named principal, or the delivery of any grain for which warehouse receipts have been issued to the obligee, without the return of the warehouse receipts, or the fraudulent con- verting to their own use of any grain for which warehouse receipts have been given to the ob- ligee above mentioned, then this obligation shall be void; otherwise to be and remain in full force and effect in law.

"Provided, however, that this obligation is is- sued upon the following express conditions:

"The surety shall be notified in writing ad- dressed to its branch office in the city of St. Louis, Mo., of the issuance of a fraudulent ware- house receipt, signed as above provided, or a vio- lation of any of the other conditions of this bond which may involve a loss or for which the surety herein is responsible hereunder im- mediately after knowledge of the violation of any other conditions of this bond becomes known to the said obligee. Upon the making of such claims this obligation shall wholly cease and terminate as regards any liability for any act on the part of the principal committed subse- quent to the making of such claims, and it shall

be surrendered to the surety upon payment of such claims.

"If the surety shall so elect, this bond may be canceled at any time by giving thirty (30) days' notice, in writing, to the obligee; the surety remaining liable for all or any default covered by this obligation which may have been committed by the principal up to the date of such termination.

"No claim shall be made under this obligation for any pecuniary loss sustained by the obligee except on account of an act which shall have been committed during the continuance of this obligation or any renewal thereof for the period commencing on the 19th day of July, 1915, and ending on the 19th day of July, 1916, and discovered during such continuance or within two months thereafter..

"That the surety shall only be liable hereunder for such portion of the total loss sustained by the obligee for any failure or neglect of the principal embraced within the terms of this bond as the penalty of this bond shall bear to the total amount of bonds furnished by the said principal in favor of the obligee, and in no event shall the surety be liable hereunder for any sums in excess of the penalty of this bond.

"In witness whereof the principal has signed its name and caused its seal to be affixed by its duly authorized officer, and the surety has caused its name and seal to be affixed by its vice president and assistant secretary on the day and year first above written."

On the same day the milling company executed to appellee its note for $10,000, due April 3, 1916, and delivered therewith and as collateral security the following:

"Alliance Milling Company.
"Deposit Wheat Receipt.
"No. 3.      Denton, Texas, July 19, 1915.
"Received in store from Mechanics'-American National Bank 10,000 bu. inspected No. 2 red wheat to test 58 lbs. or better, subject only to the order hereon of Mechanics'-American Natl. Bank and the surrender of this receipt.
"Alliance Milling Company,
"Per [signed]   J. N. Rayzor, Pres."

Thereafter, on July 27, 1915, the milling company executed to appellee its note for $10,000, due April 23, 1916, accompanying the same with a like receipt; and again, on August 23d, executed to appellee a note for $10,000, due May 20, 1916, accompanying same with a like receipt.

At the time of the execution of the first note, the milling company had in its elevator 19,015 bushels of wheat. At the time of the execution of the second note the milling company had in its elevator 10,188 bushels of wheat. At the time of the execution of the third note, the milling company had in its elevator 18,476 bushels of wheat.

The appellee supposed that the milling company had in its elevator, at the times of issuing said receipts, the amount of wheat called for in said receipts; that is to say, as much as 10,000 bushels when the first receipt was issued, 20,000 bushels when the second receipt was issued, and 30,000 bushels when the third receipt was issued.

All wheat that the milling company had on hand when the first receipt was executed and all wheat thereafter obtained by the milling company was ground into flour, and sold by it prior to March 25, 1916.

On April 1, 1916, the milling company filed a voluntary petition in bankruptcy, and was thereafter adjudged a bankrupt. The milling company did not have any wheat at the time it filed its petition in bankruptcy, nor at any time thereafter.

The appellee, when its first note fell due, April 3, 1916, ascertained for the first time that the milling company did not have on hand the wheat called for in said certificates, and immediately notified appellant of that fact, and called upon it to make good the loss occasioned thereby.

Appellee filed its claim in the bankruptcy court, and received on its debt against the milling company $1,800, leaving a balance due thereon at the time of the trial hereof, April 15, 1918, of $32,825.70, for which amount it recovered judgment herein.

The indebtedness of the milling company was $127,000. On April 3, 1916, the market price of wheat at Denton was $1.15 per bushel. Had the 10,000 bushels of wheat called for in the first receipt been on hand, this would . have increased the assets $11,500. This amount prorated to creditors would have increased the dividends 9 per cent. Nine per cent. on the $10,000 owing on the first note would have been $900, which appellee would have received from the bankruptcy court in addition to $1,800 which it did receive.

### Opinion.

[1] It is the contention of appellant that the court erred in rendering judgment for appellee for the reason that the bond herein sued on guaranteed loss against the fraudulent issuance of "warehouse receipts," and loss that might be occasioned by the withdrawal or conversion of wheat deposited as shown by such receipts, and that the allegations in appellee's petition and the uncontroverted evidence show that no "warehouse receipts" were issued by the milling company. This contention is raised by exceptions to the petition, objection to the testimony, and motion for new trial, as shown by assignments of error and bills of exception. In other words, it is the contention of appellant that "warehouse receipts," as that term is used in the bond, means public or bonded warehouse receipts. If so, judgment should have been rendered for appellant. The milling company did not issue such receipts, and, not being a public or bonded warehouseman, it could not legally have done so.

But we do not agree with this contention of appellant. The oral testimony introduced over appellant's objection shows that appellant knew at the time it executed the bond

herein sued on that the milling company was not a bonded warehouse. It must be presumed that the appellant meant to offer some security by its bond, and that the appellee, which demanded such bond as a condition precedent to making the loans, expected to receive some security by the execution and delivery of such bond. If the only security effected by such bond was against a contingency which both parties knew could never happen, then it was no security at all. It ought not to be presumed that the milling company paid appellant to execute a bond, that appellant executed a bond, and that appellee accepted the same as collateral for money loaned, and without which the loans would not have been made, when all parties knew at the time it was a worthless scrap of paper.

[2] It is always permissible, if there be any uncertainty as to the meaning of a written instrument, to ascertain the condition of the parties at the time the same was executed, and to construe the language of the instrument in the light of such circumstances.

If the bond itself does not refute the idea that the warehouse receipts therein referred to were not to be bonded warehouse receipts, it is at least sufficiently ambiguous to have rendered oral testimony as to the situation of the parties admissible to explain the meaning of that term, for which reason the court did not err in admitting such testimony. But we think the language used in the bond itself refutes the idea that the warehouse receipts therein referred to were intended to be public or bonded warehouse receipts. The bond recites:

"That whereas the above-named principal (the milling company) intends to operate, at Denton, Tex., an elevator for the storage and warehousing of grain, and from time to time will be desirous of obtaining loans from the above-named obligee (appellee, the bank) on warehouse receipts issued by it; and whereas, the obligee is desirous of granting such loans," etc.

It is evident that these "warehouse receipts" were to be issued by the milling company against its own wheat in its elevator; for, if issued to another party against wheat owned by the holder of the receipt, such receipt might have served as collateral to the party owning the wheat, as evidenced by such receipt, but would not have been collateral for the party issuing the receipt, and who, as would have been evidenced by such receipt, did not own the wheat. So, when the appellant obligated itself to "indemnify and hold harmless the said obligee against any loss or damage directly arising by reason of the issuance of fraudulent warehouse receipts," etc., it meant receipts such as were afterwards issued by the milling company, showing that it had in its elevator the wheat called for in such receipts.

[3, 4] It is a general principle of law that a public or bonded warehouseman cannot issue warehouse receipts against its own property. It is so specially provided by the laws of this state. R. S. art. 7825. It must be presumed that the parties knew the law, and that they did not contemplate that the milling company should issue what may technically be termed "warehouse receipts" against its own wheat. This is rendered doubly certain by the fact that all of the parties knew that the milling company was not a public warehouseman, and that its purpose in borrowing money was to buy wheat for itself, and store the same in its elevator until such time as it should grind the same into flour. In common parlance, a warehouse is a house used for storing goods, wares, and merchandise, whether for the owner or for some one else, and whether the same be a public or a private warehouse. 8 Words and Phrases, p. 7389. The law recognizes depots as warehouses, when the goods are held for the consignee under certain circumstances, though railroads would not be permitted under their charter powers to engage in the warehouse business in the restricted sense of a public or bonded warehouse. The term "warehouse" is frequently used to indicate a place where the owner of goods stores them until he is ready to put them on the market, and we hold that it was used in this sense in the bond herein sued on.

[5] The bond makes the appellant liable for loss occurring to appellee under either of the following conditions: (1) The fraudulent issuance of warehouse receipts; (2) the delivery of the grain called for in the receipt, without the return of the receipt; and (3) the conversion of the wheat by the milling company.

By fraudulent issuance of the receipt is meant the issuance of the same by the milling company without having the wheat in its elevator. Our findings of fact show that the milling company did have in its elevator more than 10,000 bushels of wheat when the first receipt was issued; consequently the same was not fraudulently issued. When the second receipt was issued, it should have had 20,000 bushels; and when the third was issued, it should have had 30,000 bushels. It in fact had only 10,188 bushels when the second receipt was issued, and only 18,476 bushels when the third receipt was issued. Such being the fact, we hold that the second and third receipts were fraudulently issued. What under these circumstances is the liability of appellant on its bond?

The appellant says that, if the milling company had fully complied with its contract, it would have had 30,000 bushels of wheat on hand on April 1, 1916, at which time the same would have passed into the hands of the assignee in bankruptcy, and as the receipts issued by it, not being public or bonded warehouse receipts, could amount to no more than an unrecorded chattel mortgage, the appellee would have been entitled to only its distributive shares of same. This,

we think, is correct. But the milling company did not comply with its contract.

As to the first certificate, it breached its contract by converting the wheat to its own use. But for this breach, it would have had the 10,000 bushels of wheat on hand when it became a bankrupt. In such event the appellee would have received, in addition to $1,800 that it did receive from the bankruptcy court, its distributive share of the amount that would have been realized from the sale of this 10,000 bushels of wheat.

We think a different measure of damages applies to the second and third certificates. These certificates were fraudulently issued for the reason that the wheat called for by them was not in the elevator when they were issued. The breach of the contract as to these certificates was not by the conversion of the wheat by the milling company, nor in the failure of the milling company to subsequently acquire and retain such wheat in its elevator, but in the issuance of the certificates without having the wheat against which they purported to be issued. It was this breach of the contract which occasioned the loss to appellee, inasmuch as but for this it would not have parted with its money. Having made the loans by reason of the perpetration of this fraud by the milling company, which the appellant guaranteed would not occur, its measure of damages is its loss occasioned by such breach. This loss is the money loaned to the milling company, less what it has been able to collect from said company.

Such being our views, we hold that the trial court should have rendered judgment for appellee:

On the first note, principal and interest....$ 1,009 00
On the second note, principal and interest.. 11,180 00
On the third note, principal and interest... 11,150 00

Total ...................................$23,339 00
Less dividend received....................... 1,800 00

Total ...................................$21,539 00

The judgment of the trial court is here reformed so that the appellee recovers from appellant $21,539, instead of $32,825.70, as adjudged in the court below.

As thus reformed, the judgment of the trial court is in all other respects affirmed.

Reformed and affirmed.

